United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY DAVID ELKINS, | No. C 05-1722 MHP (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| JILL BROWN, | |
| Respondent. | |

## INTRODUCTION

Jeffrey David Elkins, a prisoner at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Jeffrey David Elkins was convicted in Alameda County Superior Court of first degree murder and robbery and was found to have used a deadly weapon in the commission of the crimes. He was sentenced to a total term of 25 years to life in 1980. His habeas petition does not concern that conviction directly, but instead focuses on an October 8, 2003 decision by a panel of the Board of Prison Terms ("BPT") finding him not suitable for parole.

The BPT identified several factors in support of its determination that Elkins was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the

offense, Elkins' unstable pre-offense history, and a psychologist report that was "not totally supportive" in that it indicated a risk of return to drug abuse. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Elkins sought relief in the California courts. The Marin County Superior Court denied his petition for writ of habeas corpus in 2004 in a reasoned order. See Resp. Exh. 13. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Elkins then filed his federal petition for writ of habeas corpus. After an unsuccessful motion to dismiss, respondent filed an answer. Petitioner filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action occurred at San Quentin State Prison in Marin County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits

in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).[1]

## DISCUSSION

A.  Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

3

A critical issue in parole denial cases concerns the BPT's use of evidence about the murder that led to the conviction. Two cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point. In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), the court explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. The recent decision of Sass criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). The Sass and Biggs decisions are not polar opposites and can be harmonized: the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole (Sass), but the weight to be attributed to those immutable events decreases over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs). The one way in which Sass limits Biggs is to put to rest any idea that the commitment crime and pre-offense behavior only support the initial denial of parole. The immutable events may

4

1  support the decision to deny parole not just at the first parole consideration hearing but also
2  at subsequent hearings.  However, Sass did not dispute the principle that, other things being
3  equal, a murder committed 50 years ago is less probative of a prisoner's current dangerous-
4  ness than one committed 10 years ago.  Not only does the passage of time in prison count for
5  something, exemplary behavior and rehabilitation in prison counts for something according
6  to Biggs.  Superintendent v. Hill's standard might be quite low, but it does require that the
7  decision not be arbitrary, and reliance on only the facts of the crime might eventually make
8  for an arbitrary decision.

9  Having determined that there is a due process right, and that some evidence is the
10 evidentiary standard for judicial review, the next step is to look to state law because that sets
11 the criteria to which the some evidence standard applies.  One must look to state law to
12 answer the question, "'some evidence' of what?"

13 B.     State Law Standards For Parole For Murderers In California

14 California uses indeterminate sentences for most non-capital murderers, with the term
15 being life imprisonment and parole eligibility after a certain minimum number of years.  A
16 first degree murder conviction yields a base term of 25 years to life and a second degree
17 murder conviction yields a base term of 15 years to life imprisonment.  See In re
18 Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal
19 Code § 190.  The upshot of California's parole scheme described below is that a release date
20 normally must be set unless various factors exist, but the "unless" qualifier is substantial.

21 A BPT panel meets with an inmate one year before the prisoner's minimum eligible
22 release date "and shall normally set a parole release date. . . . The release date shall be set in a
23 manner that will provide uniform terms for offenses of similar gravity and magnitude in
24 respect to their threat to the public, and that will comply with the sentencing rules that the
25 Judicial Council may issue and any sentencing information relevant to the setting of parole
26 release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
27 panel "shall set a release date unless it determines that the gravity of the current convicted
28 offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

1  is such that consideration of the public safety requires a more lengthy period of incarceration
2  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.
3  Penal Code § 3041(b).

4  One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
5  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A
6  parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A
7  parole date set under this article shall be set in a manner that provides uniform terms for
8  offenses of similar gravity and magnitude with respect to the threat to the public."[2] The
9  regulation also provides that "[t]he panel shall first determine whether the life prisoner is
10 suitable for release on parole. Regardless of the length of time served, a life prisoner shall be
11 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
12 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
13 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
14 Code Regs. § 2402(b).

15 The regulations contain a matrix of suggested base terms for several categories of
16 crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix
17 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
18 depending on some of the facts of the crime. Some prisoners estimate their time to serve
19 based only on the matrix. However, going straight to the matrix to calculate the sentence
20 puts the cart before the horse because it ignores critical language in the relevant statute and
21 regulations that requires the prisoner first to be found suitable for parole.

22 The statutory scheme places individual suitability for parole above a prisoner's
23 expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg,
24 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the
25 prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
26 panel shall set a base term for each life prisoner who is found suitable for parole"). The
27 California Supreme Court's determination of state law in Dannenberg is binding in this
28 federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

6

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

C.     Some Evidence Supports The BPT's Decision In Elkins' Case

The BPT identified several factors supporting its decision to find Elkins unsuitable for parole, i.e., the circumstances of the offense, his unstable social history, and a mixed psychological evaluation. The Marin County Superior Court upheld the decision in a reasoned order. See Exh. 13. The Marin court stated that some evidence had to support the decision and found that some evidence did support the decision. The state court correctly identified the some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. The court cited to In re. Rosenkrantz, 80 Cal.App.4th 409, 423 (Cal. Ct. App. 2000), which cited to In re. Powell, 45 Cal. 3d 894, 904 (Cal. 1988), which cited and adopted the Superintendent v. Hill some evidence standard. Because the Marin County Superior Court's decision is the last reasoned decision, that is the decision to which 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

1.     Commitment Offense

The BPT considered the circumstances of the murder and concluded that it indicated current unsuitability. RT 54. Elkins and Larry Eckland were high school classmates and

drug dealing associates. Elkins owed Eckland money and wanted to rob him of drugs and money and then leave town. Resp. Exh. 4 (Board Report), p. 1. The record contained Elkins' statement in which he described how he beat his sleeping friend to death with a baseball bat:

> We were all high on drugs and alcohol that night of the party at [mutual friend Bob] Lambrecht's house. I entered the room where Eckland was sleeping. My first intent was to knock him out with the bat, take his money and his drugs, and get out of town. I hit him with the bat once to knock him out but he moved around and I though if I knocked him out, he wouldn't move. But when I did, I hit him again. I can't remember how many time I hit him. I had been drinking a lot, smoking pot, and doing coke all day so all I can really remember is hitting him twice.

BPT RT 12-13. Elkins put the body in his car trunk. Elkins and his friend Bob Lambrecht then cleaned up the room. Elkins passed out or went to sleep. RT 47-48. The next day, Elkins drove to a remote area near Truckee and dumped the body down the side of a hill. Id. at 13. This version was different from Elkins' original version – which he had clung to until 1994 – in which Elkins contended that he killed Eckland in self-defense when Eckland woke up and drew a knife on him while Elkins was trying to rob him.

In addition to killing Eckland, Elkins robbed him. Elkins also stole Eckland's things from his storage area and his girlfriend's house before leaving the state a few days later. RT 12. Elkins' car was later found abandoned in Montana and he was eventually arrested in Washington.

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1). The BPT considered a circumstance proper under California law.

There was some evidence to support the finding that the commitment offense tended to show unsuitability. Killing a sleeping person by beating him to death with a baseball bat

1  certainly qualifies as a killing done in dispassionate and calculated manner.  Even Elkins
2  conceded that the murder he committed would be on the more serious end of the spectrum in
3  the matrix based on the severe trauma inflicted on the victim.  <u>See</u> Petition, p. 16; 15 Cal.
4  Code Regs. § 2403(b).  Additionally, Elkins' behavior at the time of the killing – robbing the
5  victim and stealing his belongings over several days, as well as stuffing the victim's body in
6  the trunk of the car and dumping it in a remote location the day after killing him – takes his
7  case well beyond the minimum elements of first degree murder.  The record amply supports
8  the determination that Elkins committed the offense in an especially heinous, atrocious or
9  cruel manner.  The record also shows that Elkins admittedly had lied about his responsibility
10 for the crime for the first 14 years of his incarceration, making his rehabilitation during that
11 time less persuasive.  Over time, the probative value of the commitment offense may fade as
12 a predictor of current dangerousness; however, it was not irrational or arbitrary to view the
13 first degree murder here as showing Elkins' current dangerousness 23 years after he beat his
14 victim to death.

15         2. <u>Unstable Social History</u>

16         In finding him unsuitable for parole, the BPT also relied on Elkins' unstable social
17 history, which included a limited criminal history and a significant substance abuse problem.
18         Consideration of and reliance on Elkins' pre-offense criminal history was not
19 improper.  Although the prisoner's "previous record of violence" on a victim is a specifically
20 listed circumstance and non-violent criminal history is not specifically listed as a
21 circumstance that tends to indicate unsuitability, 15 Cal. Code Regs. § 2402(c)(2), the list of
22 circumstances in § 2402(c) is non-exclusive, and § 2402(b) specifically allows the BPT to
23 consider a great range of relevant and reliable information, such as the prisoner's "past
24 criminal history, including involvement in other criminal misconduct which is reliably
25 documented."  His prior criminal activity could be considered by the BPT as tending to show
26 unsuitability.  Elkins' criminal history was relatively short in that he had no juvenile record
27 and only one adult conviction; he was, however, only 19 when he committed the murder.  He
28 had been arrested in 1978 for a burglary which he described as a misdemeanor burglary in

1  which he stole drugs and money from another youth by burglarizing his house while he was
2  at school. RT 16-17. Elkins received a sentence of "60 days work furlough" for the
3  burglary. RT 17. Elkins also had been arrested in May 1979 for grand theft, but those
4  charges were dropped. RT 17. There was some evidence to support the BPT's reliance on
5  his criminal history in finding him unsuitable. Although the criminal history might not alone
6  support a finding that he was unsuitable, it could be considered as part of the overall picture
7  of his unstable social history supporting a finding of unsuitability. See 15 Cal. Code Regs. §
8  2402(b).

9         The BPT also relied on Elkins' history of drug and alcohol abuse to find him
10 unsuitable. Consideration of Elkins' drug and alcohol abuse was proper. Section 2402(b)
11 specifically allows the BPT to consider a great range of relevant and reliable information,
12 such as the prisoner's social history and mental state. Elkins had abused alcohol and had
13 used cocaine and marijuana. Resp. Exh. 4, p. 3; RT 22. He started using drugs and alcohol
14 when he was about 15, dropped out of high school when he was 17, and committed the
15 murder when he was 19. See RT 19-20, 22. He was using drugs "very heavily" at the time
16 of the killing. RT 22. There was plenty of evidence that Elkins had a severe substance abuse
17 problem before he committed the murder. Indeed, that abuse played a large part in the
18 murder: Elkins was intoxicated when he committed the murder and the murder was
19 committed in the course of an intended robbery of drugs and money from a drug dealing
20 associate to whom he owed money. The BPT's reliance on Elkins' unstable social history to
21 find him unsuitable for parole was supported by some evidence.

22        3.    Mixed Psychological Report

23        The BPT considered the August 2002 report of clinical psychologist who had
24 evaluated Elkins. The psychologist diagnosed him as having (on Axis I) conduct disorder -
25 adolescence onset type by history and polysubstance dependence (alcohol, cannabis, cocaine)
26 in institutional remission and (on Axis II) antisocial personality features. RT 36. Under the
27 section of the report on violence potential in the free community, the psychologist wrote that
28 he had a low to medium level risk for probability of violence and low risk by one measure.

10

1  RT 37. The evaluation was generally positive but the doctor had serious concerns about

2  Elkins relapsing into substance abuse:

> Mr. Elkins is therefore at some risk for resumption of substance abuse, although the risk does not appear to be high at this time. He has gained valuable insights into himself, as previously mentioned, has learned to communicate verbally to deal with anger, pain, rejection, and other emotions and not resort to violence or substance abuse. He also continues to participate in AA. Mr. Elkins is convinced that he would be able to sustain with the help of God. However, due to his probable genetic propensity for and history of chemical dependence, a blanket denial of possible relapse and resumption of alcohol/drugs use, or the belief that he is permanently free from cravings for alcohol or drugs are not helpful in maintaining abstinence. He needs to accept and realize that abstinence requires ongoing vigilance and life-long self-monitoring and commitment. As stated in the June 30, 1997 Board report by Dr. J. Hoff, psychiatrist, "cocaine is notorious for producing intense cravings, even after many years of abstinence and no cravings."

RT. 38-39.

      The BPT properly considered the mixed nature of the psychological report to find Elkins' unsuitable for parole. Consideration of and reliance on the concern identified by the psychologist was not improper. Section 2402(b) specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past and present attitude toward the crime," social history and mental state. Substance abuse was a significant feature of Elkins' pre-offense life. He had been abusing alcohol, marijuana and cocaine for several years before the murder, and they played a significant part in the killing. The psychologist had a specific concern about Elkins' potential to relapse into substance abuse because of Elkins' rigid belief in his ability to resist relapse and apparent lack of understanding about the need for constant vigilance against a return to alcohol and drug use. The psychologist also rated Elkins as having a low to medium risk for violence under one of the measures used. The BPT's reliance on the mixed evaluation from the psychologist to find Elkins unsuitable for parole was supported by some evidence.

      4.    <u>Favorable Information About Elkins</u>

      The BPT acknowledged that Elkins had positive in-prison behavior, although that positive behavior did not outweigh the negative factors mentioned above. The record showed that, for many years before the parole hearing, Elkins had not received any serious disciplinary reports. Elkins had received two serious rule violation reports, the last of which

was in 1983.  He also had received seven counseling memoranda for minor infractions, the last of which was in 1987.   Elkins also had progressed on education and occupational training.  He had obtained his GED and was participating in the San Quentin college program.  He had completed several occupational programs in auto repair, auto painting and forklift operation.  He had held various jobs in prison and had received good work reports of his efforts.   He also had participated in various self-help groups.  RT 25-26.  He had been an instructor in Biblical counseling and other religious activities.  RT 26.  And he had been commended for helping and protecting a correctional officer in 2002 who had fainted.  RT 48.  Elkins had participated in an AA-type 12-step program.  When asked about his efforts to make amends to the victim's family, Elkins stated he had not done anything because he believed "they didn't want to have anything to do with" him.  RT 29.  One BPT commissioner suggested that Elkins could try to make contact with them through the district attorney's office.  RT 30.  Elkins also had parole plans to live with his wife (who he had married while in prison) in California, had an alternative support system from his uncle's family if he moved to Michigan, had a job offer at a hardware store in Pleasanton, California, had support from his religious community, had made contact with the local AA program, and wanted to attend Patton College to obtain a ministry degree or certificate.  The BPT determined that the "positive aspects of his behavior do not outweigh the factors of unsuitability."  RT 56.

D.     Elkins Is Not Entitled To Habeas Relief Under § 2254(d)

The BPT considered proper circumstances and had sufficient evidence to support its finding that these circumstances showed Elkins' unsuitability for parole in 2003.  There is some evidence to support the determination that Elkins' commitment offense, his unstable social history and the guarded nature of the psychological report made him unsuitable for parole, 23 years into his 25-to-life sentence.

The Marin County Superior Court's rejection of Elkins' insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.   That court identified the correct legal standard and reasonably applied it.

12

1 | Elkins is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED:  December 21, 2006

Marilyn Hall Patel
United States District Judge

13

# NOTES

1.	Respondent sees § 2254 as also imposing a pleading requirement and urges that there is a pleading defect in Elkins' petition. "[B]ecause Elkins has not alleged that the state superior court's decision was contrary to or involved an unreasonable application of clearly established United States Supreme Court law, or that it was based on an unreasonable determination of the facts, he has not stated a claim upon which this Court can grant relief."  Respondent's Memo. of Points & Authorities, pp. 11-12.  The court disagrees.

The standard of review under 28 U.S.C. § 2254(d) need not be pled in order to state a claim for relief.  The writ is available for a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A petitioner must thus allege that there has been a violation of the Constitution or laws or treaties of the United States.  Respondent identifies no authority that requires the petitioner also to parrot the standard of review in § 2254(d) to state a claim.

Respondent's argument is unpersuasive for the further reason that it would allow a petitioner to state a claim for relief even if there had been no constitutional violation.  Consider an ineffective assistance of counsel claim, for example.  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), provides clearly established Federal law that such a claim is to be analyzed using a two-prong test of deficient performance and resulting prejudice.  If a state court had added a third prong of actual innocence and applied that three-prong test instead of the <u>Strickland</u> two-prong test, the decision would be an unreasonable application of <u>Strickland</u>.  That petitioner would be able to state a claim for relief under respondent's approach by alleging that <u>Strickland</u> had been unreasonably applied.  However, that petitioner is not entitled to habeas relief unless there actually was a Sixth Amendment violation, i.e., he had received ineffective assistance of counsel.  The petitioner is not entitled to the writ (e.g., release or a new trial) just because the state reviewing court got the legal standard wrong unless there also was a federal constitutional violation.  Respondent misses the very core of habeas jurisdiction by focusing on the § 2254(d) language rather than the constitution as the basis for habeas relief.

Furthermore, respondent's approach would create the incongruous situation where the pleading of a habeas claim would be different for persons petitioning under § 2254, § 2255, and § 2241, as only the first group (i.e., the state convicts) are subject to § 2254, while federal prisoners and persons who have not been convicted in state court are not.

2.	The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).